Filed 3/25/14  P. v. Johnson CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAVID LEONARD JOHNSON,<br><br>    Defendant and Appellant. | D063149<br><br><br><br>(Super. Ct. Nos. SCD233933,<br> SCD236811, SCD237392) |

APPEAL from a judgment of the Superior Court of San Diego County, Richard S. Whitney, Judge.  Affirmed in part; reversed in part; remanded with directions.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Laura A. Glennon, Deputy Attorneys General, for Plaintiff and Respondent.

This matter involves an appeal from three cases.  In case No. SCD233933, a jury convicted David Leonard Johnson of evading an officer by reckless driving (Pen. Code,[1]

---

1    Statutory references are to the Penal Code unless otherwise specified.

§ 2800.2, subd. (a); count 1) and two counts of driving under the influence (§ 23152, subd. (a), (b); counts 2 & 3).  The jury also found true the allegation that Johnson had a blood alcohol level of .15 percent or more while driving (§ 23578) in regard to both counts 2 and 3.  The trial court found true that Johnson had served qualifying time in prison on four separate occasions and had suffered two prior strike convictions (§§ 667.5, subds. (b)-(i), 668, & 1170.12).

In case No. SCD237392, a jury convicted Johnson of first degree robbery (§§ 211, 212.5, subd. (a); count 1); first degree burglary (§§ 459/460; count 2); assault with a deadly weapon and by means of force likely to produce great bodily injury (§ 245, subd. (a)(1); count 3); making a criminal threat (§ 422, count 4); and false imprisonment by violence, menace, fraud, or deceit (§§ 236/237, subd. (a); count 5).  The jury also found true that Johnson used a knife as to all counts (§ 12022, subd. (b)(1)).  Johnson admitted the allegation that he committed the offenses while he was out on bail.

Prior to the jury convicting Johnson in case No. SCD237392, the trial court excused Juror No. 3 for allegedly refusing to deliberate.  In reaching this decision, the trial court questioned the bailiff and all members of the jury.

Following the jury verdicts, two court trials were conducted.  In the first, the court found Johnson guilty of failing to appear (§ 1320.5, count 1).  In the second case, the court found true the same prison priors and prior strikes as in case No. SCD233933.  The court made these findings as to both case Nos. SCD237392 and SCD236811.

Before the two court trials and the subsequent sentencing hearing on all cases, Johnson moved to substitute in retained counsel.  The court denied the motion.

2

For case Nos. SCD233933 and SCD236811, the court sentenced Johnson to prison for four years eight months. For case No. SCD237392, the trial court sentenced Johnson to prison for a consecutive term of 42 years to life.

Johnson appeals, arguing the trial court: (1) improperly discharged Juror No. 3 during deliberations; (2) erroneously denied Johnson's motion to substitute in his retained counsel; and (3) improperly sentenced Johnson for burglary, assault, criminal threat, and false imprisonment under section 654.

We agree with Johnson that the trial court improperly discharged Juror No. 3 because Juror No. 3's inability to perform does not appear in the record as a "demonstrable reality." (See *People v. Marshall* (1996) 13 Cal.4th 799, 843.) In addition, we determine that the court erred in denying Johnson's motion to substitute in his retained attorney. As such, we reverse the convictions in case Nos. SCD237392 and SCD236811, and, although we affirm Johnson's conviction in case No. SCD233933, we vacate his sentence in that case. We also remand this matter to the superior court for further proceedings consistent with this opinion. Because we reverse the judgment in case No. SCD237392, we do not reach Johnson's final contention that his sentence violated section 654.

FACTS

Because the facts of Johnson's underlying offenses are not pertinent to the issues before us, we omit a detailed discussion of them. However, we include a brief description of the facts of case No. SCD237392 to the extent it adds context to the removal of Juror No. 3.

3

The counts in case No. SCD237392 stem from Johnson's interaction with Lindsey Gardini. At the time the offenses were committed, Gardini was working as an escort. After a dispute regarding the quality of methamphetamine Johnson provided Gardini and money Johnson owed Gardini, Johnson met Gardini at a hotel room. During this meeting, Johnson attacked Gardini, placing his arm around her throat, threatening her with a knife, and warning her that he was going to inject her with some type of street drug. Johnson and an accomplice ultimately tied up Gardini and took some of her belongings, including credit cards, an iPod, a computer, and various personal documents. Gardini eventually escaped the hotel room and ran for help.

DISCUSSION

I

*THE DISCHARGE OF JUROR NO. 3*

Johnson contends the trial court improperly discharged Juror No. 3 in case No. SCD237392. We agree.

A. Background

Case No. SCD237392 was submitted to the jury on May 23, 2012. The jury began deliberating that afternoon around 1:15 p.m. A jury note was sent to the trial court the following morning at 10:44 a.m., indicating that the jury was deadlocked on counts 2 through 5 as well as the enhancement alleged in connection with count 1. The trial court inquired of the jury foreperson as to how many ballots were taken and the makeup of the votes. The foreperson informed the court that the jury had taken seven to eight ballots and it was 11 to 1 on all remaining counts. The trial court indicated that it planned to

4

require the jury to continue deliberations. However, the bailiff observed Juror No. 12 and Juror No. 3 arguing outside the deliberation room, and when he ordered them to enter the deliberation room, Juror No. 3 indicated that she did not want to reenter.

The trial court was concerned about possible juror misconduct and requested research and argument on this issue from the parties. After relevant legal authority was presented to the court, the parties and the court discussed what action the court should take in response to the allegations regarding Juror No. 3. The trial court chose to interview Juror No. 3 and the jury foreperson to determine whether Juror No. 3 was actually refusing to deliberate, and as a consequence, was failing to abide by the court's orders. After confirming that there was no risk to Juror No. 3's health, safety, or welfare, the court asked Juror No. 3 whether she was refusing to deliberate:

> "The Court: Okay. So what you have communicated to the court was you just felt it was a hostile environment. You prefer not to go back into the jury deliberation room?
>
> "Juror No. 3: That is correct.
>
> "The Court: Is it your position at this point that you would--that you don't want to continue deliberations because you feel it's a hostile environment?
>
> "Juror No. 3: That is correct.
>
> "The Court: Okay. If the court was going to order you back into the deliberation room, would you feel comfortable going back in, yes or no?"
>
> "Juror No. 3: Yes.
>
> "The Court: If the court was to order you back into the deliberation room, do you feel you could continue to effectively deliberate along with the other jurors?

5

"Juror No. 3:  Yes."

The trial court assumed that Juror No. 3 was the holdout juror and stated that it was not uncommon for a juror to feel uncomfortable "going back in and sticking up for [her] position."  The court also noted that Juror No. 3 indicated a willingness to continue to deliberate.  Nevertheless, the court decided to question the jury foreperson.  The foreperson indicated that she believed Juror No. 3 would not deliberate further because of personal comments made toward Juror No. 3 by two other jurors.  Based on the foreperson's testimony, the court decided to question the remaining jurors.  When questioned, eight jurors stated they believed Juror No. 3 had refused to deliberate.  One juror was not sure whether there was a juror who was refusing to deliberate, and another juror denied there was a juror who refused to deliberate.

Noting that the majority of the jurors indicated their belief that Juror No. 3 was refusing to deliberate, the court issued a tentative ruling that Juror No. 3 should be replaced.  To this end, the court reasoned:

> "It's the court's continuing tentative opinion that Juror number 3 is refusing to deliberate.  This came up by her refusal to go back into deliberation room in direct violation of the court['s] order.  She did want to speak to the court at first.  [¶]  I then interviewed her and also made an interview of the foreperson who indicated it was her belief Juror 3 was refusing and would refuse to deliberate, and it's confirmed by the vast majority of the jurors in this case.  They are under a duty and obligation as instructed by law and their oath to follow the law and deliberate.  She's not following the law.  She is not deliberating in the court's view.  Therefore, it's my opinion she should be discharged and substituted in for alternate 1.  The jury will be ordered back in the deliberation room."

Johnson's counsel voiced his disagreement, contending the other jurors were not qualified to determine if Juror No. 3 had failed to deliberate.  He stressed that the jury,

6

with Juror No. 3, had reached a verdict on count 1, evidencing that Juror No. 3 was willing to deliberate. However, the trial court was unconvinced and adopted its tentative ruling as its order. It then replaced Juror No. 3 with an alternate. One hour and 22 minutes after Juror No. 3 was replaced, the jury returned a guilty verdict on all counts and allegations.

Based on a letter written by a juror to the court after the verdict, Johnson moved to unseal the jurors' identifying information, arguing certain juror misconduct occurred. The court granted the motion and conducted a hearing where the court heard testimony from all available jurors. Juror No. 1 indicated that she believed Juror No. 3 had refused to deliberate because Juror No. 3 "just wouldn't talk or listen to anything anymore." However, Juror No. 1 admitted that Juror No. 3 had never stated she would not deliberate, but did indicate she did not want to talk about her concerns any more.

Juror No. 6 testified that Juror No. 3 had "shut down" because she said she would "not . . . talk anymore" as "everyone was picking on [her]." Juror No. 6 also stated that Juror No. 3 did not respond when anyone talked to her.

Juror No. 7 recalled getting into an argument with Juror No. 3 about Juror No. 3 having "second thoughts" and Juror No. 3 referencing a comment Juror No. 7 made outside deliberation that Juror No. 3 characterized as improper. Juror No. 7 further testified he believed "the group was collectively really doing a very professional, very common and comfortable job of trying to get the entire group to reevaluate or discuss the evidence again and immediately Juror No. 3 was interpreting that as an attack against her

7

at which point she completely seemed to shut down [.]" According to Juror No. 7, Juror No. 3 said something to the effect that she was no longer going to deliberate.

Juror No. 8 testified the jury had reviewed all the facts and Juror No. 3 "still couldn't come up with a decision and she refused to listen to anything else or discuss it any further." Juror No. 8 stated that Juror No. 3 told the other jurors that she felt that she was being ganged up on. Juror 8 believed that Juror No. 3 "shut herself off[.]"

According to Juror No. 9, Juror No. 3 did not believe Gardini's testimony because she was a prostitute. She never heard Juror No. 3 state that she was not going to deliberate. Rather, the rest of the jurors asked Juror No. 3 if she could vote to convict Johnson on any of the other counts, and she said that she could not.

Juror No. 12 stated that some jurors told Juror No. 3 that she could not discredit Gardini's testimony on the basis of her profession, and Juror No. 3 responded that she would tell the judge about Juror No. 12's conversation with Juror No. 7 in the hallway.[2] Juror No. 12 told Juror No. 3 not to make threats. Juror No. 12 did not think Juror No. 3 was refusing to deliberate, but she recalled Juror No. 3 refusing to reenter the jury deliberation room.

Juror No. 4 did not recall previously telling the court that a juror was refusing to deliberate. Juror No. 5 reiterated that he did not think anyone refused to deliberate.

Juror No. 3 indicated that Juror No. 11 told her she should not have made a certain comment because the judge ordered them not to hold Gardini's profession against her.

---

[2]     Juror No. 12 testified that, while in the hallway, Juror No. 7 told him that he had been thinking about things and would be more open minded during deliberations. Juror No. 12 told Juror No. 7 to "save the rest of that for the jury room."

Juror No. 3 was not aware of any deliberations outside the deliberation room. She believed the other members of the panel exerted undue pressure against her. Juror No. 3 recalled telling other jurors that her decision was firm. She did not remember saying anything to the effect that she would not deliberate anymore.

Johnson subsequently moved for a new trial based on the jurors' testimony, arguing the court erred in dismissing Juror No. 3. The court denied the motion, finding the dismissal of Juror No. 3 was proper.

## B. Law

The Sixth Amendment guarantee of the right to a fair and impartial jury has been held to entitle "a defendant in a criminal case to be tried by the jury originally selected to determine his guilt or innocence." (*Peek v. Kemp* (11th Cir. 1986) 784 F.2d 1479, 1484; accord, *U.S. v. Bates* (9th Cir. 1990) 917 F.2d 388, 392.) However, such right "is not absolute . . . and must at times be subordinated to society's interest in just determinations of guilt or innocence." (*Id*. at p. 392.) Thus, the mere fact a holdout juror is dismissed for good cause during deliberations does not by itself violate the Sixth Amendment.

In California, section 1089 gives effect to these principles by providing that a trial court may discharge a juror and replace him or her with an alternate if the court finds the juror is unable to perform his or her duty. "Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty 'to make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged." (*People v. Espinoza* (1992) 3 Cal.4th 806, 821.) "Such an inquiry is central to maintaining the

integrity of the jury system, and therefore is central to the criminal defendant's right to a fair trial." (*People v. Kaurish* (1990) 52 Cal.3d 648, 694.)

On appeal, we review the trial court's decision to discharge a juror and replace him or her with an alternate for an abuse of discretion. If there is any substantial evidence supporting such a decision, we will uphold it. (*People v. Cleveland* (2001) 25 Cal.4th 466, 474 (*Cleveland*); *People v. Marshall*, *supra*, 13 Cal.4th at p. 843.) "Although misconduct can constitute grounds to believe that a juror will be unable to fulfill his or her function as a juror, such misconduct must be 'serious and willful.' [Citation.]" (*People v. Bowers* (2001) 87 Cal.App.4th 722, 729 (*Bowers*).) In other words, "a juror's inability to perform as a juror must ' "appear in the record as a demonstrable reality" ' " (*Cleveland*, *supra*, at p. 474), and " 'court[s] must not presume the worst' of a juror." (*Bowers*, *supra*, at p. 729.)

With regard to the ground for discharge of refusal to deliberate, our Supreme Court in *Cleveland* stated:

> "A refusal to deliberate consists of a juror's unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views. Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury. The circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge. Similarly, the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted does not constitute a refusal to deliberate and is not a ground for discharge. A juror who has participated in deliberations for a reasonable period of time may

10

not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussion will not alter his or her views." (*Cleveland*, *supra*, 25 Cal. 4th at p. 485.)

Nor may "a court . . . dismiss a juror during deliberations because that juror harbors doubts about the sufficiency of the prosecution's evidence." (*Cleveland*, *supra*, 25 Cal.4th at p. 483.)

Moreover, "it is not required that jurors deliberate well or skillfully." (*People v. Engelman* (2002) 28 Cal.4th 436, 446.) "[F]ormal discussion is not necessarily required to reach a decision or conclusion by deliberation." (*Bowers*, *supra*, 87 Cal.App.4th at p. 733.) For example, in *Vomaska v. City of San Diego* (1997) 55 Cal.App.4th 905, we concluded that a verdict based on the jury's "straw vote" at the outset of deliberations (i.e., before any substantive discussion of the case) constituted proper jury deliberation: "[After the straw vote, the jurors] decided to render a verdict rather than discuss the issue further. This procedure is a type of 'deliberations,' in that each juror--having considered the evidence and arguments independently--is setting forth his or her opinion, albeit without accompanying reasons or explanations." (*Id*. at p. 912.)

In addition, because each juror when selected must agree to render a true verdict " ' "according only to the evidence presented . . . and to the instructions of the court" ' " (*People v. Williams* (2001) 25 Cal.4th 441, 448 (*Williams*); italics omitted), a juror who refuses to follow the court's instructions may be found " 'unable to perform his [or her] duty' " within the meaning of section 1089. (*Williams*, *supra*, at p. 448.) A trial court thus may excuse a juror when it is shown as a demonstrable reality that the juror has

11

expressed a bias or is unwilling to follow the court's orders or instructions. (*Id.* at p. 461; *Cleveland*, *supra*, 25 Cal. 4th at pp. 483-484.)

Finally, if it is determined that a trial court erred in discharging a juror and replacing the juror with an alternate, "prejudice to the defendant will not be presumed." (*People v. Johnson* (1993) 6 Cal.4th 1, 20.) Rather, the "trial court's error requires reversal only if it is reasonably probable that a result more favorable to the defendant would have been reached but for the error." (*Bowers*, *supra*, 87 Cal.App.4th at pp. 735-736.)

### C. Analysis

Applying the general rules to the circumstances presented here, we conclude that the trial court abused its discretion in excusing Juror No. 3 because the record does not establish "as a demonstrable reality" that Juror No. 3 refused to deliberate or failed to adhere to her oath as a juror to follow the court's instructions or orders. When questioned by the trial court, Juror No. 3 indicated that she did not want to continue deliberating because she perceived the jury deliberation room to be a hostile environment. However, when further questioned by the trial court, she testified that she would be "comfortable" if ordered back into the deliberation room and believed that she could effectively deliberate with the other jurors. Based on Juror No. 3's comments, the court assumed that Juror No. 3 was the holdout juror and stated that it was not uncommon for a juror to feel uncomfortable "going back in and sticking up for [her] position." The court also noted that Juror No. 3 showed a willingness to continue to deliberate. There is nothing in the record indicating that the court did not believe Juror No. 3 or otherwise found her to be

12

not credible. Considering Juror No. 3's testimony along with the fact that she had deliberated for over five hours and reached agreement with the other jurors on count 1, there simply was no basis on which to excuse Juror No. 3. At that point, the court should have ordered Juror No. 3 back into the deliberation room (along with the other jurors) with directions to continue deliberating.

Moreover, we find little else in the record that supports the trial court's decision to excuse Juror No. 3. We note that nine of the remaining 11 jurors told the court that they believed Juror No. 3 had refused to deliberate. Their testimony apparently swayed the trial court to excuse Juror No. 3. However, our high court has cautioned "that a trial court should be wary of relying on the opinions of jurors, rather than on its own consideration of objective facts." (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 75; italics omitted.) Therefore, "[i]n deciding whether to discharge a juror for misconduct, a court should focus on its own considerations of a juror's conduct. The court cannot substitute the opinions of jurors for its own findings of fact." (*Ibid.*; italics omitted.) In addition, the testimony following Johnson's motion to unseal jurors' identifying information indicates that Juror No. 3 did not refuse to deliberate, but instead, had deliberated, made up her mind, and refused to change it. Such actions are not an indication that a juror has refused to deliberate. (*Ibid.* ["While some jurors may be understandably impatient that another will not adopt their view and abandon his or her own, the mere failure to change a vote is not necessarily misconduct."].)

In addition, we agree with Johnson that the instant matter is analogous to *Cleveland*, *supra*, 25 Cal.4th 466. In that case, on the second day of jury deliberations,

13

the jury sent a note requesting the replacement of one juror because he " 'does not agree with the charge and does not show a willingness to apply the law. [He] will not abide the facts and apply the law.' " (*Id*. at p. 470.) When questioned, the foreperson explained that the holdout juror did not believe that there was a valid charge, and had informed the other jurors that they were " 'not going to sway [his] mind,' " and that he did " 'not want to discuss the five points of the law as to [one of the counts].' " (*Id*. at pp. 470-471.) The foreperson also asserted that the juror only " 'halfheartedly' " listened to the other jurors before " 'interrupt[ing].' " (*Id*. at p. 471.)

Ten jurors raised their hands when the court asked if they thought there were any jurors who were not deliberating or considering the opinions of others. (*Cleveland*, *supr*a, 25 Cal.4th at p. 471.) When questioned individually, the other jurors asserted that the holdout juror was disregarding the facts and the law and had refused to answer questions from the others. (*Id*. at pp. 471-473.) Indeed, the holdout juror asserted that he had said all he had to say and would not answer any questions. (*Id*. at p. 473.) The holdout juror explained that he had listened to other jurors, accepted the court's instructions, but had a different view of the facts of the case. (*Ibid*.) Despite his testimony, the trial court excused the juror, finding that he was "not functionally deliberating with the other jurors" because he had refused to respond to their questions, and that "[i]t doesn't do any good to talk in generalities as he does want to[.]" (*Ibid*.)

The California Supreme Court concluded the record did "not establish a 'demonstrable reality' that the . . . juror refused to deliberate." (*Cleveland*, *supra*, 25 Cal.4th at pp. 485-486.) Rather, "[a]lthough 10 jurors raised their hands when the court

14

asked whether one or more jurors were not deliberating, individual questioning of the jurors revealed that it was the conclusion arrived at by [that juror] that was at issue." (*Id.* at p. 486.)

Here, the record indicates that Juror No. 3 had deliberated and would continue to deliberate if the court ordered her to do so. The jurors who claimed Juror No. 3 was refusing to deliberate are like the majority jurors in *Cleveland*, *supra*, 25 Cal.4th 466 in that their real concern was that they disagreed with the conclusions reached by Juror No. 3. As the jurors in the instant matter made clear during their testimony at the hearing after Johnson's motion to unseal jurors' identifying information, the same behavior that led them to believe that Juror No. 3 had "shut down" was very similar to the behavior that our high court deemed was not misconduct in *Cleveland*.

The People attempt to distinguish *Cleveland*, *supra*, 245 Cal.4th 466, arguing Juror No. 3 "flatly refused to deliberate." However, the record does not support the People's argument. To the contrary, the record suggests Juror No. 3 deliberated, was willing to continue to deliberate if ordered to do so, but had made up her mind based on the evidence presented.

The People also contend Juror No. 3 refused to deliberate because she "rejected any of the evidence presented that inculpated [Johnson] because of her bias against" Gardini's profession. Although there is some support in the record that Juror No. 3 did not find Gardini credible to some extent because she was a prostitute, it is an unsupported leap in logic to assume that she rejected *all* inculpatory evidence, especially when she voted with the other jurors to convict Johnson under count 1. Further, even if Juror No. 3

15

did not find Gardini credible, Juror No. 3's disbelief of Gardini's testimony does not support the conclusion that Juror No. 3 was refusing to deliberate. It merely shows that Juror No. 3 viewed the evidence differently from the rest of the jurors. This is not misconduct justifying the removal of Juror No. 3. (See *Cleveland*, *supra*, 25 Cal.4th at p. 483; cf. *People v. Allen and Johnson*, *supra*, 53 Cal.4th at p. 75.)

In addition, as Johnson points out, during closing argument, his trial attorney argued that Gardini's profession as a prostitute made her more likely: (1) to associate with criminals and (2) falsely implicate others. In addition, Johnson's trial attorney contended that Gardini was not credible because she was a prostitute. The People did not object to this argument, and it is apparent that a primary focus of Johnson's defense at trial was challenging Gardini's credibility.

In sum, the trial court's reasons for discharging Juror No. 3 are not supported by the evidence and do not establish as a demonstrable reality misconduct justifying such excusal. We therefore conclude the trial court abused its discretion in excusing Juror No. 3 and replacing her with an alternate.

The question remains whether this error is prejudicial and requires reversal. The evidence indicates that Juror No. 3 was a holdout juror for acquittal on counts 2 through 5 on which Johnson was ultimately convicted after an alternate juror was sworn in and the jurors were told to reconsider the evidence anew. After less than an hour and a half of deliberations, the new jury returned verdicts of guilty on all counts. Because the court had been advised before its inquiry that the jury was deadlocked on counts 2 through 5,

16

the requisite harm for a reversal is shown. (*Cleveland*, *supra*, 25 Cal. 4th at p. 486; *Bowers*, *supra*, 87 Cal.App.4th at pp. 735-736.)

## II

## *DENIAL OF JOHNSON'S MOTION TO SUBSTITUTE COUNSEL*

Johnson next maintains the trial court erred in denying his motion to substitute in retained counsel prior to his trial on the failure to appear, the prior strikes determination, and the sentencing for all his cases. We agree.

### A. Background

At the hearing scheduled for the court trials on the failure to appear and the priors, Johnson moved to be relieved of his appointed counsel and to substitute in retained counsel. An associate attorney affiliated with Johnson's retained counsel appeared at the hearing. Johnson, through the associate attorney, claimed he was not comfortable with his current representation and that there had been a breakdown in communication and trust. The associate attorney represented that the retained counsel would be prepared to go forward the following morning.

The People responded that the motion was untimely as Johnson had retained counsel four days prior and did not notice either the People or Johnson's current, appointed counsel. Moreover, the People claimed that no notice was given as to a motion to continue and Johnson brought the motion on the same day set for the court trials on the priors and the failure to appear. The People also noted that this motion, so late in the proceedings of all three cases (one matter had trailed for over a year), demonstrated Johnson's continued attempts to delay all three matters.

17

The court denied the motion:

> "All right.  I'm going to deny the request to substitute attorneys.  I think it's prejudicial to both parties.  I don't think there is good cause for it.  And I think that from a procedural and substantive standpoint as pointed out by the prosecution, it's untimely.  So the request is denied.  [Johnson's appointed counsel] will remain attorney of record in this case.  [¶]  We are post-verdict by the jury and beginning a brief bench trial and also the prior conviction, adjudication.  We are literally past 70 percent of this proceeding, and the request is just simply not timely.  It wasn't properly noticed, and it's not based upon good cause."

After denying the request, the court trailed the matter, based on its own schedule, to the following day.  On that day, immediately before the court trials, Johnson moved for a *Marsden*3 hearing, which the court denied.

Almost two months later, Johnson's retained counsel appeared in court and informed the court that he had filed a civil action against Johnson's appointed attorney thereby creating a conflict of interest.  Johnson therefore moved to disqualify his appointed counsel.  The trial court requested authority on whether Johnson's appointed attorney could continue representing Johnson when a malpractice claim had been filed against him by Johnson.

At a subsequent hearing, Johnson's appointed attorney stated he did not believe, based on *People v. Hardy* (1992) 2 Cal.4th 86, that the malpractice claim would interfere with his representation.  Moreover, it was discovered that the malpractice suit was not properly filed, and thus was not pending.  The trial court denied the motion to disqualify Johnson's appointed counsel.  To this end, the court stated:

---

3       *People v. Marsden* (1970) 2 Cal.3d 118.

"I think it is clear that [Johnson] not only in this situation but in every step of the way has attempted to delay this court in the administration of justice including the trial and including sentencing and now he's trying as a last ditch effort to disqualify after multiple *Marsden* hearings, which have all been denied . . . create a conflict of interest where this court does not feel a conflict arises. The court is fully aware of the rules of professional responsibility that govern attorneys in the state of California. [¶] And I have found nothing through multiple *Marsden* hearings and the investigations and the testimony which is all under seal to show that either an actual or even an implied conflict of interest arises or has arisen between [Johnson] and [Johnson's appointed attorney]. [¶] I've witnessed the representation every step of the way, and I've seen nothing that even begins to arise to the level of grounds for disqualification. [¶] So that being said, the motion to disqualify is denied, and [Johnson's appointed attorney] will continue as attorney of record in this matter."

## B. Law

"The Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence.' . . . [A]n element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him." (*U.S. v. Gonzalez-Lopez* (2006) 548 U.S. 140, 144 (*Gonzalez- Lopez*).) As the Supreme Court explained, "[the Sixth Amendment] commands, not that a trial be fair, but that a particular guarantee of fairness be provided-- to wit, that the accused be defended by the counsel he believes to be best." (*Id.* at p. 146.) "Deprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received." (*Id.* at p. 148.) Accordingly, erroneous deprivation of the right to counsel of choice is structural error requiring per se reversal. (*Id.* at p. 150.)

The Sixth Amendment right to chosen counsel is not absolute, and can be abrogated to serve a " 'compelling purpose,' " such as "[e]nsuring the ethical and orderly administration of justice . . . ." (*U.S. v. Ries* (9th Cir. 1996) 100 F.3d 1469, 1471.) The Supreme Court has said that courts "have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them," which in some circumstances supersedes a defendant's right to counsel of his or her choice. (*Wheat v. U.S.* (1988) 486 U.S. 153, 160.) The Court has further recognized that trial courts have "wide latitude in balancing the right to counsel of choice against the needs of fairness." (*Gonzalez-Lopez*, *supra*, 548 U.S. at p. 152.) Our high court has said that although the state should keep to a minimum "its interference with the individual's desire to defend himself in whatever manner he deems best, using any legitimate means within his resources," that desire "can constitutionally be forced to yield only when it will result in significant prejudice to the defendant himself or in a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case." (*People v. Crovedi* (1966) 65 Cal.2d 199, 208; accord, *People v. Ramirez* (2006) 39 Cal.4th 398, 422; *People v. Baylis* (2006) 139 Cal.App.4th 1054, 1071.)

We review the denial of a request to substitute counsel for an abuse of discretion. (See *People v. Ortiz* (1990) 51 Cal.3d 975, 983-984; *People v. Courts* (1985) 37 Cal.3d 784, 789-790.)

C. Analysis

Here, the People contend the trial court properly denied Johnson's motion to substitute in retained counsel because the substitution of counsel would have disrupted the proceedings. However, we find little support in the record for the People's position. Although Johnson's retained counsel did not appear at the time Johnson moved to substitute in retained counsel, Johnson requested a one-day continuance of the trials. The court denied the motion, but ultimately trailed the trials for a day because of its schedule. As such, Johnson's requested continuance would have disrupted the proceedings no more than the court's own schedule.

The People also attempt to justify the court's denial of Johnson's motion on the grounds that the trial court reasonably concluded that Johnson's *Marsden* motions and motion to substitute in retained counsel were thinly disguised attempts to delay the proceedings. We disagree. As discussed above, Johnson's requested continuance of a day was no more than the time the court actually trailed the trials based on its schedule. Further, there is nothing in the record that leads us to believe Johnson's motion to substitute new counsel was brought primarily to delay the proceedings.

In addition, the People's reliance on Johnson's *Marsden* motions is misplaced. Under a *Marsden* standard, a defendant must show that appointed counsel is not providing competent representation or that there is an irreconcilable conflict such that ineffective representation is likely to result. (*People v. Dickey* (2005) 35 Cal.4th 884, 917.) And "a defendant does not have the right to appoint new counsel absent a clear showing of inadequate representation." (*People v. Silva* (1988) 45 Cal.3d 604, 622.)

21

Thus, in considering a *Marsden* motion, the court is focused on whether the defendant will be ineffectively represented by counsel. A motion to substitute retained counsel requires no such consideration. Instead, a court generally grants that motion unless denial of it serves a "compelling purpose." (See *U.S. v. Ries*, *supra*, 100 F.3d at p. 1471; see also *People v. Ramirez*, *supra*, 39 Cal.4th at p. 422; *People v. Crovedi*, *supra*, 65 Cal.2d at p. 208; *People v. Baylis*, *supra*, 139 Cal.App.4th at p. 1071.) In other words, a *Marsden* motion is very different from a motion to substitute in retained counsel. The facts underlying Johnson's *Marsden* motions thus have no value in our evaluation of the court's denial of Johnson's motion to substitute in retained counsel, especially when Johnson has not appealed any order denying his *Marsden* motions.

The People also focus on Johnson's postmotion tactics (e.g., making an additional *Marsden* motion and his retained counsel asking for additional time to respond to appointed counsel's authority that no conflict existed) to argue these events show that Johnson's retained counsel was not prepared to represent Johnson "to the extent necessary for these criminal proceedings." We disagree. Johnson's *Marsden* motion has no bearing on his retained counsel's ability and preparedness to represent him. Also, we are not swayed by Johnson's request for additional time to allow his retained counsel to respond to the authority provided by Johnson's appointed counsel. Johnson's retained counsel would not have had to respond to any such authority if the court had granted Johnson's motion to substitute in retained counsel. Put differently, Johnson's counsel's need for additional time to respond to appointed counsel's authority does not implicate his lack of preparation to represent Johnson.

22

Simply, there is no justification in the record to support the trial court's denial of Johnson's motion to substitute in retained counsel. There is no basis for the People's argument that the granting of the motion would have disrupted the proceedings. To the contrary, Johnson only requested a one-day continuance of the trials, which is the identical time period the court trailed the trials after it denied Johnson's motion. We therefore conclude that the trial court abused its discretion in denying Johnson's motion to substitute in retained counsel.

DISPOSITION

The conviction in case No. SCD233933 is affirmed. The convictions in case Nos. SCD237392 and SCD236811 are reversed. Johnson's sentence in case No. SCD233933 is vacated. We remand this matter to the superior court for further proceedings consistent with this opinion.

HUFFMAN, Acting P. J.

WE CONCUR:


O'ROURKE, J.


AARON, J.

23